FILED
2006 Aug-23  AM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>SOUTHERN DIVISION</u>

KARLOS MAYS,                                  )
                                              )
                Plaintiff,                    )
                                              )
v.                                            ) CIVIL ACTION NO. 03-PWG-1051-S
                                              )
CITY OF FULTONDALE, ALABAMA, ET AL.,          )
                                              )
                Defendants.                   )

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

On May 7, 2003 Karlos Mays initiated this action with a complaint filed in the United States

District Court for the Northern District of Alabama alleging that Fultondale police officers Tim

Evans, Allen Evans, and Jeff Jones together with Police Chief Byron Pigg and the City of Fultondale

had violated rights secured by the United States Constitution giving rise to an action pursuant to the

provisions of 42 U.S.C. § 1983.  (Doc. #1).  In addition to the federal claim Mr. Mays asserted state

law claims arising from the same conduct.  On August 26, 2004 Mr. Mays amended his complaint

(doc. #16).  The amended complaint asserted Fourth Amendment violations from (1) an unlawful

traffic stop without probable cause and (2) an excessive force claim arising from Mr. Mays' arrest.

In addition to the combined unlawful seizure and excessive force claim Mr. Mays asserted state law

claims of assault and battery (count two), the intentional infliction of emotional distress (count

three), negligence (count four), malicious prosecution, false arrest and false imprisonment (count

seven), asserted constitutional claims against the City of Fultondale and the Chief of Police for the

failure to train and supervise the officers (count five) and the failure to enact or enforce a policy

(count six).  (Doc. #16).  After the amended complaint a report of party planning meeting was filed

on March 31, 2005.  (Doc. #27).[1/]  The action was reassigned to United States District Judge Inge P. Johnson.  The parties requested and Judge Johnson consented to the reassignment of the action to the undersigned magistrate judge.  The parties then consented to the dispositive jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c).  Both parties waived a jury trial and this action came to be heard on August 21, 2006.  Pursuant to Rule 52, *Federal Rules of Civil Procedure*, the followings findings of fact and conclusions of law are entered following the non-jury trial.

## GENERAL PRINCIPLES OF APPLICABLE LAW

Mr. Mays' action includes claims made against Byron Pigg as Chief of Police and the individual officers in their official capacities.  "Official-capacity suits ... 'generally represent only another way of pleading an action against the entity of which the officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165, 87 L.Ed.2d 114, 105 S.Ct. 3099 (1985) (quoting *Monell v. New York Department of Social Services*, 426 U.S. 658, 690 n.55 (1978)).  "As long as the government entity receives notice and an opportunity to respond an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham*, 473 U.S. at 166.  Thus suing the individual officers and Fultondale Police Chief Pigg in their official capacities, Mr. Mays effectively sues the City of Fultondale itself.

Under the Fourth Amendment to the Constitution made applicable to the states under the Fourteenth Amendment, Mr. Mays has a right to be free from unlawful seizures and detentions.  His

---

[1/]     Mr. Mays' attorney in this action was hampered in his pursuit of this claim because of Mr. Mays' 2005 arrest on federal charges of trafficking in cocaine.  At the time of the trial of this action Mr. Mays had entered a plea of guilty to federal cocaine trafficking charges and was awaiting sentencing.  The federal charge is wholly unrelated to any of the incidents described in the complaint.  It is also a matter of record that at the time of his arrest, Mr. Mays had never been convicted of a felony offense and at the time of his testimony in this action he had entered a plea of guilty to the federal cocaine trafficking charge but judgment has not yet entered in that he has not been sentenced.

complaint alleges that the actions of the officers constituted an unlawful seizure in addition to a claim of excessive force.  A seizure is unlawful if made without probable cause.  Probable cause for an arrest exists "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing or it about to commit an offense." *Draper v. Reynolds*, 369 F.3d 1270, 1276 (11th Cir. 2004) (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003)).  The Supreme Court has made clear that the probable cause threshold may be satisfied if there was probable cause to arrest the suspect on any offense, even if it is not the offense (or even closely related to the offense) identified by law enforcement officers at the time of the arrest.  See *Devenpek v. Alford*, 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (Rejecting notion that arrest is unlawful under the Fourth Amendment if the offense for which there is probable cause to arrest is not "closely related" to the offense identified by the arresting officer.); *Lee v. Ferraro*, 284 F.3d 1188, 1195-96 (11th Cir. 2002) (For purposes of an arguable probable cause inquiry, it is irrelevant whether the officers cited a correct offense for the arrest because neither the officer's subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest.).

In addition to the 1983 claim premised upon an unlawful seizure Mr. Mays also asserts a violation of his Fourth Amendment rights to be free from the use of excessive force in the execution of even a lawful arrest.  In *Graham v. Connor*, *supra*, the Supreme Court stated that when addressing any § 1983 claim, the court must identify the specific constitutional right allegedly infringed, then judge the claim by reference to the specific constitutional standard which governs that right. *Graham v. Connor*, 490 U.S. at 109, 104 L.Ed.2d at 443.  All claims that law enforcement officers

3

have used excessive force in the course of an arrest, an investigatory stop, or other seizure of a free citizen are properly characterized as protections of the Fourth Amendment.  To determine whether the amount of force used was reasonable the court looks at "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.  The Eleventh Circuit has applied a balancing test utilizing three factors to determine whether or not the amount of force used by a law enforcement officer is reasonable.  These factors are: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; and (3) the extent of the injury inflicted.  *Draper v. Reynolds*, 396 F.3d at 1277-78.

   With respect to the individual defendants, they are liable for damages only when the complaint alleges a violation of clearly established constitutional law.  Defendants Allen Evans and Byron Pigg are entitled to qualified immunity if the complaint fails to allege a violation of a clearly established right.[2/]  Qualified immunity is a protection designed to allow government officials to avoid the expense and disruption of trial.  *Ansley v. Heinrich*, 925 F.2d 1339, 1345 (11th Cir. 1991).  It applies to the assertion of constitutional and federal statutory claims brought against state actors.  See *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1295 (11th Cir. 1998) "Qualified immunity offers complete protection for government officials sued in the individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have know.'" *Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  The qualified immunity inquiry is a fact specific one which may be implicated on a motion to dismiss,

_____

[2/]     Mr. Mays voluntarily dismissed all claims against Jeff Jones at the close of the evidence.

the summary judgment stage, or at the conclusion of a trial.  *St. George v. Panelis County*, 285 F.3d 1334 (11th Cir. 2002).

With respect to the individual defendant Byron Pigg it is not alleged Police Chief Pigg participated in any way in the underlying facts giving rise to this litigation.  Vicarious liability will not sustain a § 1983 claim.  "It is axiomatic, in § 1983 actions, that the liability must be based on something more than a theory of *respondeat superior*."  *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990); see also *HC ex rel Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir. 1986).  "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or where there is a causal connection between actions of the supervising official and the alleged constitutional violation."  *Brown*, 906 F.2d at 671.  "The causal connection can be established when a history of widespread abused puts the responsible supervisor on notice of the need to correct the alleged deprivation and he failed to do so."  *Id*.

As a municipality, the City of Fultondale is a "person" for purposes of § 1983 and may be subject to liability under limited circumstances.  *Monell*, 436 U.S. 658.  Explaining its holding in *Monell*, the Supreme Court has said that "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue.  *Respondeat superior* or vicarious liability will not attach under § 1983."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

A municipality may be held liable under § 1983 "if the plaintiff shows that a custom or policy of the municipality was the moving force behind a constitutional deprivation."  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).  The burden is on the plaintiff to "identify a municipal policy or custom that caused [his] injury."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).  A municipality is not automatically liable under § 1983 even if there was

5

inadequate training or supervision of its police officers.  The Supreme Court has stated that municipal liability will be found only in the following limited circumstances: when there is inadequate training or supervision of employees; when the failure to train or supervise is a city policy; and where and when the city policy causes the city employees to violate the citizen's constitutional rights.  *Id.*, citing *City of Canton*, 489 U.S. at 389-91.  In the absence of an express written or oral policy a plaintiff "may prove a city policy by showing that the municipality's failure to train evidents a deliberate indifference to the rights of its inhabitants."  *Id.*  To establish this "deliberate indifference" the plaintiff must present some evidence that there was knowledge on the municipality's behalf of a need to train in a particular area and that despite this knowledge, there was a deliberate choice to not conduct the necessary training.  "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise."  *Id.* at 351.  This "high standard of proof is intentionally onerous for plaintiff" because without it, a city would be subjected to *respondeat superior* liability which was not a result intended by § 1983.  *Id.*, n.10.

In addition to Mr. Mays' claims under § 1983, his state law claims are properly before this court pursuant to the provisions of 28 U.S.C. § 1367.  Alabama law provides both the substantive basis for the claim as well as applicable and statutory immunity.  For example, § 6-5-338(a), *Code of Alabama* (1975) "shields police officers from tort liability for discretionary acts performed 'within the line and scope of [their] law-enforcement duties.'" *Norris v. City of Montgomery*, 821 So.2d 149, 153 (Ala. 2001) (quoting § 6-5-338(a)).  The cited section provides in pertinent part:

> [a]     Every policy officer, ... whether appointed or employed as
> such peace officer by the state or a county or municipality
> there of, ... shall at all times be deemed to be officers of this

6

> state, and as such shall have such immunity from tort liability
> arising out of his or her conduct in performance of any
> discretionary function within the line and scope of his or her
> law enforcement duties.

*Id.*, 6-5-338(a).

The Alabama Supreme Court has defined discretionary functions as "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise 'in judgment and choice and involving what is just and proper under the circumstances.'"  *Ex parte City of Gadsden*, 781 So.2d 936, 938 (Ala. 2000) (quoting *Bright v. Wynn,* 682 So.2d 1, 2 (Ala. 1996)).  "'[E]xercising judgment in the enforcement of the criminal laws of the state,' ... is recognized as discretionary function."  *Ex parte Tuscaloosa County*, 796 So.2d 1100, 1106 (Ala. 2000) (quoting *Ex parte Cranman*, 792 So.2d 392, 405 (Ala. 2000)).  The Alabama Supreme Court has also held that "acts taken in bad faith, while wilful or malicious conduct, <u>will not be considered discretionary in nature</u>."  *Ex parte City of Montgomery*, 758 So.2d 565, 569 (Ala. 1999) (citing *Couch v. City of Sheffield,* 708 So.2d 144, 153 (Ala. 1998)); *Barnes v. Dale*, 530 So.2d 770 (Ala. 1998); *DeStafney v. University of Alabama*, 413 So.2d 391 (Ala. 1981). (emphasis added). In any discretionary-function immunity case a court assessing the claim must make a "pragmatic assessment of what, if any, degree of immunity is necessary to enable the particular governmental function be effectively performed."  *Bell v. Chisom*, 421 So.2d 1239, 1241 (Ala. 1982).  With regard to police officers performing law enforcement duties the Alabama Supreme Court has made clear that discretionary function immunity must exist because a police officer should not be required to "ponder and ruminate over decision that should be made in a split second."  *White v. Burchfield*, 582 So.2d 1085, 1087 (Ala. 1991).  State discretionary function immunity specifically applies to law

7

enforcement officers arresting or attempting to arrest persons. *Cranman*, 792 So.2d at 405.  See also
*Telfare v. City of Huntsville,* 481 So.2d 1222, 1227 (Ala. 2002).  Police officers are not entitled to
absolute immunity under § 6-5-338(a).  Rather, the immunity is that from tort liability which can be
"withheld if an officer acts with wilful or malicious intent on in bad faith."  *Borders v. City of
Huntsville*, 875 So.2d 1168, 1178 (Ala. 2003), see also *Gary v. Crouch*, 867 So.2d 310, 313 (Ala.
2003) ("[W]here a municipal police officer is engage in a discretionary function with respect to the
conduct complained of, he or she would be immune under 6-5-338) 'unless his [or hers] were
conducted with wilful and malicious intent or bad faith.'" (Quoting *Ex parte City of Montgomery*
758 So.2d at 570).  *Cranman*, 792 So.2d at 405 (holding that a state agent is not entitled to immunity
"where the state agent acts wilfully, maliciously, fraudulently, in bad faith, beyond his or her
authority, or under a mistaken interpretation of the law.")

## SUMMARY OF TESTIMONY

Karlos Mays

    Karlos Mays testified that on May 8, 2001 he lived with his mother at 1216 19th Street S.W.
in Birmingham, Alabama.[3] As a result of a motorcycle accident at the age of 22, Mr. Mays' right arm
is paralyzed and generally immobilized in a sling.  Mr. Mays testified that on May 8 he and his
companion of 11 years, Roshida Hoyett, were driving to his uncle's home in the Gardendale area of
Northern Jefferson County.[4] According to Mr. Mays, after the couple left the Winn Dixie parking
lot with Roshida Hoyette driving, two police officers in separate cars stopped the vehicle.  Mr. Mays

---

[3]    At the time he testified in this action Mr. Mays was 32 years old.

[4]    The uncle, John Rodriguez, apparently was caring for Jasmine and Karleeta, the children of Mr. Mays and
Hoyette.  Mays and Hoyette stopped at the Winn Dixie store in Fultondale, Alabama.

testified that a police officer asked Hoyette for her identification and asked her if "there was a problem." Mr. Mays stated that he was then asked to identify himself. Mays claims that he told the officers his name was Karlos Cedino Mays. Mr. Mays testified that Karlos Cedino Mays was his "full name." During the stop, Mr. Mays was asked if he had been in the Winn Dixie in Fultondale and he said "no." He heard the dispatcher give the description of a man who had been in the Winn Dixie with his arm in a sling. According to Mays's trial testimony he was not being "belligerent or cussing." He admitted, however, that during his deposition testimony he had said that he might have "gotten smart" with the officers. According to Mr. Mays he was placed in the rear of the police vehicle where an unidentified police officers asked Mays if he had called the officer a "white cracker." Mr. Mays testified that the unidentified officer sprayed pepper spray on his feet or on the floor of the car and closed the door. He stated that he then began choking and coughing. After a short time an unidentified officer tried to hit him with a baton while he remained was in the patrol car. He testified that 4 to 6 officers dragged him from the vehicle and beat him with batons and kicked him. Mr. Mays testified that he heard a police officer tell Roshida Hoyett to get back in the car. Mr. Mays stated that he lost consciousness until he was taken out of the police car at the Fultondale City Jail. He testified that his eyes were washed out by paramedics but he could not remember if he was asked if he wanted additional treatment. Mr. Mays acknowledged that during his deposition testimony he had stated that he had declined additional medical treatment stating only that he wanted to "bond out." Mr. Mays remained overnight in the Fultondale City Jail and was transported to the Jefferson County Jail by Fultondale police officers. Mr. Mays's left eye was swollen and the Jefferson County Jail refused to accept him until he was seen by a physician. Mays

testified he was then taken to the hospital where he was treated and released to the custody in Jefferson County.

Mr. Mays testified that was charged with felony assault in the second degree for allegedly striking a Fultondale police officer, and misdemeanor charges of providing false information and resisting arrest. The charges were ultimately dismissed although Mr. Mays testified that he did not know why.

Tim Evans

Tim Evans testified that he is a former police officer with the City of Fultondale. Prior to serving with the Fultondale Police Department he had served as a police officer in Warrior for five years in addition to two years with the Morris Police Department and one year with the City of Fairfield Police Department. He is a graduate of the University of Alabama Police Academy at the University of Alabama. On May 8, 2001 he received a call from Officer Jeff Jones who had been dispatched to the Fultondale Winn Dixie. Jones had received reports that a black male and female had been involved in a series of altercations with employees, customers, and each other at the store. A manager had provided a license tag number for the vehicle. Jones notified other officers of the vehicle and its identification. Tim Evans found himself directly behind the vehicle in question. He turned on his emergency light. The car continued on for more than ½ mile before pulling to a stop. Evans testified that he went to the driver's side and asked for identification from the driver who proved to be Roshida Hoyett. Another Fultondale patrol car, driven by Allen Evans, no relation to Tim Evans, fell in behind Officer Tim Evans's car. Allen Evans arrived almost immediately after Tim Evans. Allen Evans approached the vehicle from the passenger side. While asking questions of the driver, Tim Evans saw Karlos Mays reach inside the sling on his right arm. He asked Mays

not to reach inside the sling because he was not certain whether Mays had a weapon.  Allen Evans asked Mr. Mays for his identification.  Mr. Mays was uncooperative and said he did not have his drivers license.  Allen Evans asked Mr. Mays for his name and was told "Sudan Mays."  Tim Evans testified that in addition to spelling his name as S-u-d-a-n, Mr. Mays refused to spell his last name for Officer Allen Evans when asked.  He provided Allen Evans with a birth date which also proved not to be his.  Tim Evans testified that Roshida Hoyett said about Karlos Mays that "his ass is crazy tonight."  Tim Evans testified that at the time of the arrest only he and Allen Evans were present.

Tim Evans testified during the defendants' case that when Mr. Mays was removed from the vehicle he was not handcuffed because his arm was in a sling.  He stated that he smelled alcohol on Mr. Mays breath and he slurred his words when replying to the questions of Allen Evans.  He also stated that Mr. Mays seemed very agitated and belligerent.  When officers learned that the name provided to Officer Allen Evans was not that of the plaintiff the decision was made to place him under arrest.  Mr. Mays was placed inside the patrol car and Officer Allen Evans walked back toward the Lexus driven by Ms. Hoyett to tell her that she could leave.  Mr. Mays who was not handcuffed refused to put his feet inside the car and then leaned back on the seat when Officer Tim Evans approached.  When Evans went forward Mays kicked him in the chest which resulted in injury to the officer's ribs.  Mays then got out of the car and attempted to run.  He was tackled by Officer Tim Evans who was later assisted by Officer Allen Evans.

Jeff Jones

Jeff Jones testified that on May 8 he received a call from the dispatcher reporting a disturbance at the Winn Dixie.  A Winn Dixie employee by the name of Emanuel reported that a black male had been disorderly and intoxicated.  When he arrived at the scene of the arrest of Mr.

11

Mays, Ms. Hoyett was not longer there. While the police report indicated that he was an arresting officer he was not involved in the arrest. He testified that he saw no altercation between the officers and Mays.

Allen Evans

Allen Evans is employed as a police officer with the City of Fultondale. He testified that on May 8, 2001 only three officers were near the arrest of Mr. Mays and only he and Tim Evans participated. He approached the car driven by Ms. Hoyett from the passenger side. He asked Mr. Mays if he had been at the store which Mr. Mays denied. Mays continued to use profanity and asserting that he had committed no crime. When asked for his name, he told Officer Allen Evans that he was Sudan (S-u-d-a-n) Mays. Allen Evans asked him for the spelling but Karlos Mays refused to answer. Mays also gave him a date of birth. Allen Evans specifically testified that he was never told that the plaintiff's name was "Karlos." Evans testified that he ran a check to determine whether an Alabama drivers license had been issued in the name of Sudan Mays and no such name was on file. Mr. Mays had refused to produce a drivers license contending that he did not have one. Mr. Mays was asked to exit the vehicle and taken to the rear of the Lexus. When Tim Evans was told by Roshida Hoyett that the passenger's name was Karlos Mays, Officer Allen Evans made the decision to place him under arrest for providing false information. He and Tim Evans walked Mr. Mays back to the patrol car driven by Tim Evans and placed him in the rear of the vehicle. Mr. Mays at this point was not handcuffed according to both officers. Allen Evans walked by to the Lexus to tell Ms. Hoyett that she could leave. As he turned back to the patrol car he saw Karlos Mays kick Tim Evans in the chest. Mays then attempted to run and was grabbed by Officer Tim Evans. Allen Evans testified that Mr. Mays and Tim Evans fell heavily to the ground. Allen Evans stated that he

12

used his collapsible metal baton to strike Mr. Mays 3 or 4 times in an attempt to assist Officer Tim

Evans.  Allen Evans testified that he tried to strike Mr. Mays on the arms and legs but eventually

holstered his baton because "it was doing no good."  He then assisted Officer Tim Evans in wrestling

Mr. Mays and securing his good arm.[5]

Tim Evans said that he was certified pepper spray instructor.  He also testified that no officer

would spray mace inside a vehicle because the resulting residue would remain in the car for as much

as two weeks.

Police Chief Byron Pigg

Byron Pigg acknowledged that a manual was used to provide training and policy for

Fultondale police officers.  Subsequent to the filing of this action Chief Pigg reviewed the incident

reports and other materials related to Mr. Mays's arrest and took no disciplinary action.

## CONCLUSIONS OF FACT

1.      There was probable cause for Officers Tim Evans and Allen Evans to effect a stop of the

Lexus driven by Roshida Hoyett on May 8, 2001.  The probable cause included a discrete

traffic offense of speeding and a reasonable suspicion to investigate further the allegations

of the incident at the Winn Dixie store.[6]

---

[5]      Mr. Mays is slender man with only one arm.  The police officers are both much larger.

[6]      While Mr. Mays correctly asserts that the officers could not "arrest him" for a misdemeanor offense of
harassment, disturbing the peace or disorderly conduct, this notion presupposes that only misdemeanor offenses
may have been within the ambit of the charges which might have arisen from the Winn Dixie incident.  At the
time the officers had no way of knowing.

2.     Roshida Hoyett was told that the reason she was stopped was for speeding.  Mr. Mays was asked to identify himself.[7]

3.     Karlos Mays intentionally provided limited and erroneous information with respect to his name which was intended to prevent the officers from identifying him.

4.     Karlos Mays provided a date of birth which was not his own with the intention to mislead the officers.  Mr. Mays was arrested for the offense of providing false information which is a violation of Alabama law including but not limited to § 13A-9-18.1(a), a class A misdemeanor.

5.     Mr. Mays was not handcuffed when he was placed in the rear of Tim Evans's patrol car.

6.     Mr. Mays kicked Officer Tim Evans in the chest and attempted to flee.

7.     Mr. Mays was tackled by both Officers Tim Evans and Allen Evans.

8.     Mr. Mays was sprayed in the face and eyes with pepper spray.

9.     Mr. Mays was struck with a collapsible metal baton at least 3 or 4 times by Officer Allen Evans.

10.    Mr. Mays, while in the process of being controlled, was pushed or thrown down on to the patrol vehicle.

11.    Mr. Mays was transported to the Fultondale City Jail and never lost consciousness.[8]

12.    Mr. Mays was treated for pepper spray and refused additional medical treatment.

---

[7]    It is for the purposes of this judgment irrelevant whether the request was made in a racially derogatory manner or not.  Ms. Hoyett testified that the officers were racially abusive.  If the request was made in such a manner it is repugnant and the City should take action to prevent such conduct.  However, racial epithets and similar derogatory comments are not themselves actionable under § 1983.

[8]    Officer Allen Evans testified that when Officer Tim Evans testified that he was on his way with Mr. Mays to the jail Mays could be heard cursing and screaming in the background.

13.     Mr. Mays was transferred to the Jefferson County Jail and at the time he appeared at the Jefferson County Jail his left eye was severely swollen.

14.     Mr. Mays was treated at Cooper Green Hospital for both the eye injury and for bruises on his arms and legs.

15.     Mr. Mays sustained a serious injury to his eye in the altercation with Officers Tim and Allen Evans.

16.     There is no evidence of a municipal policy which gives rise to a constitutional deprivation. There is no evidence that Police Chief participated in, condoned or otherwise caused the injuries to Mr. Mays.

17.     The ultimate dismissal of the criminal charges against Mr. Mays was occasioned by a combination of requests for continuances by Mr. Mays's attorneys, Mr. Mays's discharging at least two retained attorneys and the fact that Officer Allen Evans, an essential witness to the assault of Office Tim Evans, was in Afghanistan or otherwise on classified military service from early April 2002 until the dismissal in October 2002.

## CONCLUSIONS OF LAW

### The Fourth Amendment Seizure Issue

The Fourth Amendment protects individuals from "unreasonable searches and seizures" by government officials, and its protections extend to "brief investigatory stops of persons or vehicles." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). For brief investigatory stops, the Fourth Amendment is satisfied if the officers had a "reasonable suspicion" to believe that criminal activity "may be afoot." *Id.*, citing *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When determining whether suspicion exists, courts must consider the

totality of the circumstances to determine whether the police officer had a "particularized and objective basis" for suspecting illegal wrong doing. *Arvizu*, 534U.S. at 273, 122 S.Ct. 744. In doing so, "the reviewing court must give due weight to the police officer's experience." *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991). A decision to stop a vehicle is reasonable under the Fourth Amendment whether the officer has probable cause to believe that a traffic violation has occurred. *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999). In *Whren v. United States*, 517 U.S. 806, 819, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) the Supreme Court refused to deviate from the traditional common law rule that probable cause justifies a search or a seizure regardless of the officer's subjective intent at the time of the traffic stop so long as he has "probable cause to believe that [the driver] has violated the traffic code." The stop of the Lexus was constitutional. After the stop of the Lexus it was reasonable under *Terry v. Ohio* for the officers to ask questions related to the incidents arising at the Winn Dixie. So long as the traffic stop itself was not prolonged, the questions were constitutional.

The arrest

The officers were within the scope of the Constitution when asking questions related to the incidents at Winn Dixie. They were also within the scope of *Terry* when they asked Mr. Mays for his name.[9] Under Alabama law when Mr. Mays provided false information, there was probable cause for his arrest for a violation of § 13A-9-18.1, *Code of Alabama* (1975). See *State v. S.L.S.,* 777

---

[9]     While Mr. Mays is correct in his assertion that he could not have been arrested for the misdemeanor offenses at the Winn Dixie, the evidence is clear that he was not. The Constitution does not prohibit officers from asking questions related to the investigation of a even misdemeanor offense in the course of an otherwise justified detention.

So.2d 318 (Ala. Ct. Crim. App. 2000).[10/]  The traffic stop of Ms. Hoyett and the arrest of Mr. Mays were constitutionally permissible and each based upon probable cause.

The excessive force claim

Mr. Mays is entitled to protection against unconstitutionally excessive force.  However, "the right to make an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat therein to effect it.'" *Draper v. Reynolds*, 369 F.3d at 1278 (quoting *Graham v. Connor*, 490 U.S. at 396).  It is the excessive use of force that is constitutionally prohibited.  "*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportional to the need for that force, which if measured by the severity of the crime, the danger to the officer, and the risk of flight."  *Lee*, 284 F.3d at 1197.

The offense charged in the present case was a misdemeanor, however, the credible testimony established that Mr. Mays had assaulted Officer Tim Evans and, in doing so committed a felony offense, then attempted to flee.  It is undisputed that Mr. Mays was struck several times with a baton. It is also undisputed that he was sprayed with pepper spray.[11/] Under the *Graham* reasonableness inquiry "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances [then] confronting them, without regard to their underlying intent or motivation." *Graham* at 397.  "In order to determine whether the amount of force used by a police officer was proper, a court must ask "whether a reasonable officer would believe that this level of force' was

---

[10/]    Indeed, under Alabama law the conduct may have also constituted "resisting arrest."  *See Sims v. State*, 733 So.2d 926 (Ala. Crim App. 1998).

[11/]    Mr. Mays's testimony that the pepper spray was placed on his feet or inside the car and the door then closed is unbelievable.

necessary in the situation at hand.'" *Lee* at 284 F.3d at 1197 (citing *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)).

There is no question that Mr. Mays was struck with a collapsible baton resulting in bruises on his arms and legs.  It is also more likely than not that the injury to his left eye occurred either when he fell to the ground, when he was pushed against the car, or possibly when he was struck  in the eye with the baton.  The core question here is not the injury but whether the force used was reasonable under the circumstances in light of the police officer's forced split second decision. *Graham*, 490 U.S. at 396-97.

In light of the credible testimony the court concludes that the injuries to Mr. Mays, the most significant of which was the injury to his left eye, while serious, were the result of an objectively reasonable use of force under the circumstances.[12]

Municipal liability

For reasons set forth above the court concludes that there is simply no evidence of a municipal policy or the absence of a policy with respect to training which will sustain municipal liability.

Supervisor liability

There is simply no evidence in the record to sustain individual liability with respect to Police Chief Byron Pigg.

In conclusion, with respect to the federal  § 1983 claim the stop, investigation, seizure, and arrest of Karlos was constitutionally permissible.  The use of force in restraining Mr. Mays after he had been placed under arrest was objectively reasonable.  There is no municipal liability or

---

[12]    Mr. Mays's testimony of a beating by 4 to 6 police officers is simply incredible.

individual liability on the part of Police Chief Byron Pigg.  Judgment is ENTERED on all § 1983

claims is made in favor of defendants and against the plaintiff.

State law claim

The claim of intentional infliction of emotional distress, assault and battery, false

imprisonment and false arrest all involve claims of intentional misconduct, none of which are

sustained by the record as set out above.  The generalized allegation of "negligence" is barred by the

discretionary function immunity of the State of Alabama.

Accordingly, judgment is ENTERED against Mr. Mays on all state law claims and in favor

of the defendants.

As to the foregoing it is SO ORDERED this the 23rd day of August, 2006.


_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE